# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **PHEDREK T. DAVIS** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:11-cv-0613** |
| | ) | |
| **DEBRA JOHNSON, Warden** | ) | **Judge Campbell** |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

Petitioner Phedrek T. Davis, a prisoner in state custody at Turney Center Industrial Complex, has filed a *pro se* petition under 28 U.S.C. § 2254 for a writ of habeas corpus (ECF No. 1), as amended by two supplemental filings (ECF Nos. 43, 48). The respondent has answered in opposition to the petition, and has filed a complete copy of the underlying state-court record. The petition is ripe for review. For the reasons set forth herein, petition will be DENIED and this action DISMISSED with prejudice. Petitioner's motion for evidentiary hearing (ECF No. 61) will accordingly be DENIED.

## I.       PROCEDURAL BACKGROUND

On June 23, 2005, the petitioner was found guilty by a Davidson County Jury of: (1) first degree premeditated murder; (2) misdemeanor assault, and (3) attempted second degree murder. On August 31, 2005, the petitioner was sentenced to life imprisonment for first degree murder, with a consecutive fifteen year sentence for attempted murder and concurrent 11 month 29 day sentence for assault. (ECF No. 36-1, at 81–83.) His conviction and sentence were affirmed on direct appeal. *State v. Davis*, No. M2006-00198-CCA-R3-CD, 2007 WL 2051446 (Tenn. Ct. Crim. App. July 19,

2007) ("*Davis 1*") ; *State v. Davis*, 266 S.W.3d 896 (Tenn. 2008), *cert. denied*, 577 U.S. 906 (2009) ("*Davis 2*") .

Thereafter, the petitioner filed a *pro se* petition in the state court for post-conviction relief. (ECF No. 36-17, at 37–94.)  The trial court summarily denied the petition. (ECF No. 36-17, at 95–96.)  That decision, including the decision not to appoint counsel, was affirmed on appeal. *Davis v. State*, No. M2009–01616–CCA–R3–PC, 2010 WL 1947379 (Tenn. Ct. Crim. App. May 14, 2010), *perm. appeal denied* (Tenn. Nov. 10, 2010) ("*Davis 3*") .

While petitioner's post-conviction petition was pending, he filed a *pro se* petition for writ of error coram nobis. (ECF No. 36-22, at 37–115).  The trial court dismissed the petition (ECF No. 36-22, at 128–130), and was affirmed on appeal. *Davis v. State*, M2009-02310-CCA-R3-CO, 2010 WL 3270015 (Tenn. Ct. Crim. App., Aug. 19, 2010) ("*Davis 4*") .  Petitioner then filed a second petition for writ of error coram nobis. (ECF No. 36-26, at 4–13).  The trial court dismissed the petition (ECF No. 36-26, at 14–15) and was again affirmed on appeal. *Davis v. State*, M2011-01366-CCA-R3-CO, 2012 WL 3017806 (Tenn. Crim. App., July 23, 2012) ("*Davis 5*").

While his second petition for writ of error coram nobis was pending, Petitioner Davis filed his petition under 28 U.S.C. § 2254 in this Court on May 23, 2011. (ECF No. 1, at 40 (date of petitioner's signature)).  On the petitioner's motion, the Court held this matter in abeyance pending final resolution of his state court case and reopened the matter on August 16, 2012. (ECF No. 23). Respondent filed an answer on September 26, 2013. (ECF No. 53.)  The petition is timely, and this Court has jurisdiction.

On May 28, 2013, Petitioner filed a document styled "Petitioner's Supplement to His Writ of Habeas Corpus" raising three claims of ineffective assistance of counsel (ECF No. 43), which the Court construed as a motion to amend the petition and retroactively granted on June 20, 2013. (ECF

No. 44.) On July 3, 2013, Petitioner filed a second document styled "Petitioner's Supplement to His Writ of Habeas Corpus" raising five more claims of ineffective assistance of counsel. (ECF No. 48.) The Court presumed this to be the product of a misunderstanding by Petitioner of the Court's June 20 Order, and retroactively granted the second amendment by Order entered May 2, 2014, but expressly stated that the amendment being granted was the second supplement that was already in the record and instructed Petitioner that he was not to file any additional supplements without prior leave of Court. (ECF No. 55.)

In the same Order, the Court required Respondent to file an amended answer to include a response to Petitioner's supplemental claims and to account for the impact of *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014). Respondent complied with a comprehensive amended answer filed June 2, 2014. (ECF No. 60.)

Disregarding the Court's express instruction, on May 6, 2014, Petitioner filed a **third** document styled "Petitioner's Supplement to His Writ of Habeas Corpus," offering thirty-two pages of what he describes as an "amended petition in order to add a subpoint to his ineffective assistance of counsel claim." (ECF No. 57, at 2.) The document does not contain any request for leave to amend and does not offer any explanation for why the proffered bases for relief could not have been included in the original petition three years ago or either of the two amendments already permitted. *See Foman v. Davis* 371 U.S. 178, 182 (1962) (noting that valid reasons to deny an amendment include undue delay and repeated failure to cure deficiencies by amendments previously allowed). As Petitioner did not actually move to amend his petition for a third time to include this "subpoint," and the Respondent has already filed her answer to the petition as previously amended (ECF No.

60), the Court does not consider this latest filing by Petitioner as part of the pleadings in this case.[1]

## II. STATEMENT OF FACTS

The Tennessee Supreme Court summarized the testimony presented during trial as follows:[2]

This case arises out of the shooting death of Susan Phelps on August 21, 2003, as she stood inside her apartment in Nashville, Davidson County, Tennessee.

Mr. Eula Beasley testified that he had known the victim two to three months prior to her death and had visited her apartment "a lot." On the day of the shooting, Mr. Beasley was at the victim's apartment along with several other people. Because the electricity was out in the apartment, the victim had run an extension cord from the Defendant's apartment to hers. According to Mr. Beasley, the Defendant (appellant Phedrek T. Davis) saw the victim coming out of his apartment and accosted her on the sidewalk. Mr. Beasley was standing next to the victim when this occurred. The Defendant slapped her across her face and said, "bitch, I'm going to get you, don't be in this house when I come back." Mr. Beasley had previously told one of the detectives that the Defendant also threatened "to kill her when he come [sic] back, he was going to shoot up the house and everything."

After this altercation, Mr. Beasley and the victim were both in the victim's living room "having fun." Mr. Beasley explained that he had not taken the Defendant's threats seriously. Within fifteen minutes, Mr. Beasley saw the Defendant walking fast toward the victim's apartment. As the Defendant came abreast of the living room window, which was open, he began shooting into the apartment through the window. The Defendant continued walking and shooting. Mr. Beasley described the gun as an automatic which the Defendant was firing with one hand. The victim was standing "right in front of the window." When the gunfire began, Mr. Beasley turned and ran to a back room where he broke a window and jumped out. He did not see the victim get shot. He did, however, hear "a bunch" of shots.

---

[1] For the same reasons, the Court has not considered Petitioner's "Reply to the Respondent's Answer" (ECF No. 47), in which he asserts ineffective assistance of counsel in connection with each of the claims in his original petition, as a supplement or amendment to the petition. Moreover, each of the allegations in the Reply would fail if the Court considered them on the merits, either because the alleged ineffectiveness did not prejudice Petitioner for the reasons set forth in the Court's disposition of the underlying claims (e.g., allegation that counsel "didn't research this issue" of sequential consideration of lesser-included offenses (*id.* at 2, ¶ 8)), or because the efforts Petitioner faults counsel for not making would have certainly been fruitless (e.g., counsel's failure to "stop the trial and appeal this issue right then" (*id.* at 1, ¶ 3)).

[2] The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

After jumping through the window, Mr. Beasley ran up the alleyway, where he hid in some bushes out of fear. From there, he saw the Defendant drive by.

On cross-examination, Mr. Beasley admitted that he had been smoking crack cocaine on the day of the shooting. He also admitted to an aggravated burglary and several theft convictions.

George Boone testified that he had known the victim several months before her death. On the day of the shooting, he and several other people were at the victim's apartment. The victim was walking outside. Mr. Boone stated that, while he was standing in her living room looking out the door, he saw an altercation between the Defendant and the victim; he saw no one else present during the argument. Mr. Boone heard the Defendant call the victim "bitch" and state, "somebody got my stuff." He saw the Defendant slap the victim, after which she walked a short distance away. The Defendant also left. After the victim returned to her apartment, the Defendant "came to the door after that and said, somebody got my shit, you-all need to get up out of here." Mr. Boone testified, "He said I don't care if it's your husband or whoever is in there, when I come back I'm going to shoot this m* * * * * f* * * * * * up." None of the other people in the apartment responded to the Defendant, but Mr. Boone "told them, they need to come out of there because of what he said." Although the others did not take the Defendant's threat seriously, Mr. Boone did, and he walked out of the apartment.

Mr. Boone stationed himself a short distance away, in front of the apartment. From his position, he could look through the living room window; he saw the victim sitting in front of it. Fifteen to thirty minutes later, he saw the Defendant returning. The Defendant walked over to near where Mr. Boone was standing, reached down, and "come [sic] up with a pistol." The Defendant pointed the gun and "opened fire." Mr. Boone stated that the Defendant shot through the window and that he shot from right to left. Neither man spoke to the other. When he was done shooting, the Defendant "just walked on back around the building" where he got in a car and drove away.

Mr. Boone went to the apartment and looked in. He saw the victim lying on the floor.

Dr. Stacy Turner testified about the victim's autopsy. According to Dr. Turner, the victim had suffered a gunshot wound to the face in which the bullet perforated the victim's right carotid artery and caused her death. The bullet was recovered from the victim's body.

Officer William Kirby, a member of the identification crime scene section of the Metro Nashville Police Department, testified that he reported to the scene of the crime at about 4:30 in the afternoon on the day it occurred. He stated that it was a bright and sunny day and that he could see through the apartment's living room window (which was open) into the interior. Officer Kirby confirmed that the apartment had no electricity. He composed an accurate, although not to scale,

drawing of the scene. The drawing depicted an apartment with a front door between two front windows. The door and window to the right of the door (from the perspective of one approaching the door from the outside) were along the outside wall of the living area. The window to the left of the door was along the outside wall of a bedroom. The living room window bore three bullet strikes: two to the frame and one through the screen. The front door frame bore one bullet strike. The bedroom window bore four bullet strikes-one to the frame and three through the glass-and the interior wall of the bedroom (parallel with the outside wall in which the window was located) also bore four bullet strikes. In the area in front and outside of the bedroom window, six 40 caliber shell casings were found. In the living room, a lead bullet was found; in the kitchen, near where the victim fell, a copper jacket was found. In the bathroom, another copper jacket was found and in the back bedroom, another lead bullet.[1]

1. An expert witness explained to the jury that the type of bullets recovered from the scene consisted of an inner lead core surrounded by a copper brass alloy jacket and that the two layers sometimes separated on impact.

Officer Kirby testified that, although he and other members of the unit searched "front, back and side" for shell casings, the only ones they found were in the area fronting the bedroom window. He also opined that "at least five [bullets] made it inside of the apartment."

Detective David Achord testified that he was the primary investigator in the case. He attended the victim's autopsy. He took custody of the bullet recovered from the victim's body and submitted it for ballistics testing. He also submitted for ballistics testing the projectiles and shell casings recovered from the crime scene. He took out a warrant for the Defendant's arrest on August 22, 2003, the day after the victim was killed, but the Defendant was not taken into custody until September 30, 2003.

Officer Kendall Jaeger testified that he is a "firearm tool mark examiner in the forensics and firearms section of the identification section" of the Metro Nashville Police Department. He examined the projectiles and discharged cartridge cases that were recovered during the investigation of this case. He determined that the six cartridge cases had all been discharged from a single weapon and that the weapon was a semi-automatic handgun.

Officer Jaeger was unable to identify the bullet that was recovered from the victim's body because the metal jacket surrounding the lead core had been stripped away. He identified two complete bullets recovered from the scene and two bullet jackets recovered from the scene as having been fired from the same gun. Because the gun that fired the cartridges was not recovered, however, he was unable to state conclusively that the cartridge cases and the bullets/bullet jackets were fired from

one and the same gun. He acknowledged, however, that it was reasonable to infer that the same gun fired both the cartridge cases and the bullets.

Detective Roy Dunaway testified that he assisted in booking the Defendant. Using a photograph known to be of the Defendant, Det. Dunaway asked the Defendant if the photograph was of him. The Defendant acknowledged that the photograph was of him and inquired, "what's this about?" Det. Dunaway told the Defendant that there was a criminal homicide warrant on him but that he did not know anything about the case. The Defendant stated that he had not killed anyone. Det. Dunaway said that he did not have any information on the case and that he did not "know anything about the dude that got killed." The Defendant then stated, "it wasn't a dude, it was a lady." Det. Dunaway acknowledged that the police department had publicized the murder and its search for the Defendant prior to his apprehension.

The defense presented no proof.

*State v. Davis*, 266 S.W.3d 896, 898-900 (Tenn. 2008).

## III.    ISSUES PRESENTED FOR REVIEW

In his petition for habeas corpus, Davis asserts the following claims for relief:

1. That the trial court erred in denying his pretrial motion to sever count 5 for criminal impersonation, and that he was prejudiced by such error;

2. That the trial court erred in allowing the state to introduce testimony that the defendant was in the company of an individual wanted in another jurisdiction at the time of his arrest;

3. That the trial court erred by denying him the right to question an eyewitness, Eula Beasley, regarding charges which had been either dismissed or nolled by the state prior to his testimony and while the charges were pending against the defendant, violating his state and federal constitutional right to confront witnesses against him and due process of law;

4. That the trial court erred in permitting the state to use a police report to refresh the recollection of its witness, Eula Beasley, in violation of Rule 612 of the Tennessee Rules of Evidence;

5. That the trial court erred in denying the appellant the right to offer proof that a police officer known for writing false reports wrote the report which was used to refresh the recollection of Eula Beasley;

6. That the trial court erred in denying defense counsel the opportunity to cross-examine detective Achord about the excited utterance made to him by Roxie Whitson who was present at the time of the shooting;

7. That there was insufficient evidence to support the verdict of guilty on assault, first degree murder, and attempted second degree murder;

8. That the jury instructions directing sequential consideration of lesser-included offenses are unconstitutional in that they dictate the method of deliberations, intruding on the independence of the jury and compromising the right to a trial by jury on all lesser included offenses;

9. That the trial court erred in failing to charge the jury on the lesser included offense of reckless endangerment committed with a deadly weapon, thereby denying the defendant the constitutional right to a trial by jury on all lesser included offenses;

10. That the trial court erred in instructing the jury on each offense and each lesser included offense contained within the jury instructions by deviating from the pattern jury instruction in a manner that requires the jury to determine if it has reasonable doubt about the defendant's innocence rather than a reasonable doubt about the defendant's guilt;

11. That the prosecutor committed misconduct by misstating the evidence in closing argument and denigrating defense counsel in closing;

12. That the trial court erred in admitting the presentence investigation report, enhancing the defendant's sentence and imposing consecutive sentences;

13. That the trial court erred in denying defendant's pretrial motion to suppress his statement made at the time of his arrest to MNPD detective Roy Dunaway;

14. That the prosecution withheld Detective Bernard's report, which was favorable to petitioner, thereby facilitating perjury by Mr. Beasley and violating petitioner's Fourteenth Amendment right to Due Process;

15. That the prosecution withheld Detective Bernard's report, which prevented petitioner from discovering the author of the initials on the report until after trial and prevented him from impeaching Mr. Beasley's false testimony;

16. (ECF No. 43) That his trial attorney was ineffective for failing to seek a continuance to prepare to cross-examine state star witness Eula Beasley;

17. (ECF No. 43) That his trial attorney was ineffective for failing to hire a handwriting expert to examine the handwriting on the statement that Eula Beasley said he signed;

18. (ECF No. 43) That his trial attorney was ineffective for failing to discover prior to trial that former homicide detective E.J. Bernard, who took Eula Beasley's statement, was under investigation for changing witnesses' statements;

19. (ECF No. 48) That trial counsel was ineffective in presenting no defense to the charges against petitioner in violation of the Sixth, Eighth and Fourteenth Amendments;

20. (ECF No. 48) That he was denied Due Process and a fair trial because the prosecution presented the false and misleading testimony of Eula Beasley and withheld material evidence concerning the false and misleading nature of Eula Beasley's testimony in violation of the Sixth, Eighth and Fourteenth Amendments;

21. (ECF No. 48) That the jury rendered an unconstitutional verdict because the jury was provided with a constitutionally infirm instruction on "reasonable doubt" in violation of the Sixth, Eighth and Fourteenth Amendments;

22. (ECF No. 48) That he was denied the effective assistance of counsel for any alleged failure to properly raise any of the issues alleged in his petition at an earlier point in the proceedings, in violation of the Sixth, Eighth and Fourteenth Amendments;

23. (ECF No. 48) That he was denied Due Process at trial due to the cumulative effect of the errors alleged, in violation of the Eighth and Fourteenth Amendments.

## IV.    STANDARD OF REVIEW

### A.    Defaulted or Unexhausted Claims

A federal district court will not entertain a petition for writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine which promotes comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Once his federal claims have been raised in the highest state court available,[3] the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).

A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987).  If a habeas petitioner retains the

---

[3] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose*, 455 U.S. at 518, 520–22); *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")).

If, however, an unexhausted claim would be procedurally barred under state law, for instance by a statute of limitations or a state rule barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted, and may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). Specifically, in order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both "cause" for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims will result in a "fundamental miscarriage of justice." *Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 311 (2012) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

1.     "Cause" Defined

Generally, the "cause" standard in procedural-default cases requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts" to raise a claim in the state courts. *Wogenstahl*, 668 F.3d at 321 (quoting *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (internal quotation marks omitted)). Factors that may constitute such cause "may include interference by officials, an attorney error rising to the level of ineffective assistance of counsel, or a showing of

a factual or legal basis for a claim that was not reasonably available." *Id.* Until recently, a prisoner could not demonstrate cause by claiming that he received ineffective assistance of counsel during state post-conviction proceedings. *See Coleman*, 501 U.S. at 752–53 (holding that attorney error is not cause to excuse a default). That barrier was based on the premise that an individual does not have a constitutional right to counsel in post-conviction proceedings, so the prisoner "must bear the risk of attorney error that results in a procedural default." *Id.* (internal quotations omitted).

However, in *Martinez v. Ryan*, 566 U.S. —, 132 S. Ct. 1309 (2012), the Supreme Court held that the ineffective assistance of post-conviction counsel can establish "cause" to excuse the procedural default of a defendant's substantial claim of ineffective assistance at trial, but only where state procedural law prohibits defendants from raising such claims on direct appeal and instead requires defendants to raise the claims for the first time in post-conviction proceedings. *Id.* at 1318–19. Less than a year later, the Supreme Court issued *Trevino v. Thaler*, 569 U.S. —, 133 S. Ct. 1911 (2013). *Trevino* extended *Martinez* to apply to cases where, although state procedural law might permit defendants to raise ineffective-assistance claims on direct appeal, a state's "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Id.* at 1921.

Applying *Trevino*, the Sixth Circuit Court of Appeals has now recognized that "Tennessee defendants, too, are highly unlikely to have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014). The court therefore held, based on *Martinez* and *Trevino*, that "ineffective assistance of post-

conviction counsel can establish cause to excuse a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial." *Id.* at *7 (citations omitted).

The *Martinez* Court's creation of a narrow exception to the procedural-default bar stemmed from its recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Id.* at 1318. In other words, *Martinez* requires both that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," *see id.* at 1320 ("The rule of Coleman governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts."), and that the claim be a substantial one. *See id.* at 1318–19 (noting that the prisoner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit").

### 2. "Actual Prejudice" Defined

The Sixth Circuit recognized long ago that the prejudice prong has been an "elusive concept for the lower federal courts." *Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir. 1986). However, "several guidelines can be distilled from the Supreme Court's pronouncements and the case law interpreting those pronouncements." *Id.* First, it is clear that the petitioner must demonstrate a "prejudice" that actually resulted from the alleged constitutional violation and not from trial counsel's failure to meet state procedural guidelines. *Id.* (*see United States v. Frady*, 456 U.S. 152 (1982) (prejudice must result from the errors of which defendant complained)). Second, the burden is on the petitioner to

show that he was prejudiced by the alleged constitutional error. *Id.* (citing *Frady*, 456 U.S. at 170). Moreover, the petitioner must show that there was "actual prejudice not merely a possibility of prejudice." *Id.* (citing *Engle v. Isaac*, 456 U.S. 107, 129 (1982)). Third, in analyzing a petitioner's contention of prejudice, the court should assume that the petitioner has stated a meritorious constitutional claim, and avoid merging the question of prejudice with the issue of the merits. Id.[4]

Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman v. Thompson*, 501 U.S. at 750. Neither the Supreme Court nor the Sixth Circuit has yet provided guidance as to how district courts reviewing habeas petitions are to implement the rulings in *Martinez* and *Trevino*. In one of the first circuit court opinions to address the issue directly, the Ninth Circuit held that, to establish that his claim is "substantial," a habeas petitioner must "show that his post-conviction relief counsel was ineffective under *Strickland v. Washington*." *Clabourne v. Ryan*, 745 F.3d 362, 376 (9th Cir. 2014). That is, the petitioner must show both that his post-conviction counsel's performance was constitutionally deficient and that the petitioner was prejudiced by the deficiency. *Clabourne*, 745 F.3d at 376. Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [post-conviction] proceeding would have been different." *Strickland*, 466 U.S. 668, 694 (1984). Further, according to the Ninth Circuit, "actual

---

[4] The Sixth Circuit illustrated this point by reference to *Frady*, in which "the petitioner argued that he was prejudiced by a jury instruction which erroneously instructed on the element of malice, leading to a conviction of first degree murder rather than manslaughter. In rejecting this contention, the Supreme Court did not examine whether Frady's claim was meritorious but turned to whether Frady would have been prejudiced by such an error. Finding the evidence overwhelming on the issue of malice, the Court concluded that the jury instruction, if erroneous, could not possibly have resulted in prejudice." *Maupin*, 785 F.2d at 139 (citing *Frady*, 456 U.S. at 170–72; *Wainwright v. Sykes*, 433 U.S. 72, 91 (1977) (weight of evidence negated any possibility that petitioner was actually prejudiced by admission of inculpatory statement)), In *Maupin*, the petitioner argued that he was prejudiced by the state court's refusal to consider his claim that there was insufficient evidence for a reasonable jury to find him guilty. In reviewing the claim, the court assumed that there was insufficient evidence and concluded, "[g]iven this assumption," that it was "self-evident" that the petitioner would have been prejudiced by such a constitutional violation. *Maupin*, 785 F.2d at 139–40. The court therefore proceeded to consider the actual merits of the claim.

prejudice," for purposes of the *Coleman* analysis in the *Martinez* context, requires a showing that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the claim has some merit." *Clabourne*, 745 F.3d at 377 (quoting *Martinez*, 132 S. Ct. at 1318).

The *Clabourne* court recognized some "overlap" between the two prejudice requirements:

Within the "cause" prong there is an element of "prejudice" that must be established: to show ineffective assistance of post-conviction relief counsel, a petitioner must establish a reasonable probability that the result of the post-conviction proceeding would have been different. The reasonable probability that the result of the post-conviction proceedings would have been different, absent deficient performance by post-conviction counsel, is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective. The prejudice at issue is prejudice at the post-conviction relief level, but if the claim of ineffective assistance of trial counsel is implausible, then there could not be a reasonable probability that the result of post-conviction proceedings would have been different.

*Clabourne*, 745 F.3d at 377-78.

In other words, in many habeas cases seeking to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was "substantial" enough to satisfy the "actual prejudice" prong of *Coleman*. If not, because the "cause and prejudice" standard is conjunctive rather than disjunctive, the reviewing court would have no need to consider whether the petitioner has established cause to overcome the procedural default, in the form of ineffective assistance of post-conviction counsel.

3.      The "Fundamental Miscarriage of Justice" Standard

A fundamental miscarriage of justice results when one who is "actually" innocent is convicted. *Gibbs v. United States*, 655 F.3d 473, 477 (6th Cir. 2011). Actual innocence means factual innocence, not merely legal insufficiency. *Luster v. United States*, 168 F.3d 913, 915 (6th Cir. 1999).

"Actual innocence" is an extremely narrow exception, and "claims of actual innocence are rarely successful." *Gibbs*, 655 F.3d at 477 (citing *Schlup v. Delo*, 513 U.S. 298 (1995)). Moreover, "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* (citing *Herrera v. Collins*, 506 U.S. 390 (1993)).

### B.      Standard of Review of Fully Exhausted Claims

Even when a petitioner's application for a writ of habeas corpus raises only federal constitutional claims that have been properly exhausted in the state courts, this Court's review of the state court's resolution of those issues remains quite limited. The standard for reviewing applications for the writ of habeas corpus is set forth in 28 U.S.C. § 2254(d), which restricts federal court authority to remedy state-court errors to instances of "extreme malfunction[]" of the state process, as opposed to "ordinary error correction through appeal." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). This section states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In other words, a federal court is bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable

application of clearly established federal law. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Further, this Court must presume the correctness of state court factual determinations, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous."), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [this Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (citation omitted).

With respect to the "unreasonable application" clause of § 2254(d)(1), the Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Williams*, 529 U.S. at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> . . . . [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409–11 (emphasis original).

With these principles in mind, the Court will turn to the examination of the claims raised in the petition for habeas relief.

## V.     ANALYSIS AND DISCUSSION

### A.     Claim 1: Motion to Sever

Petitioner asserts that he suffered prejudice at trial as the result of the trial court's failure to sever one count of impersonation, on which he was ultimately acquitted. (ECF No. 1, at 5.)

Petitioner was indicted for criminal impersonation because several weeks after the murder he allegedly gave Detective Dunaway a false name and only admitted his true identity upon being confronted with a photograph that identified him.  *Davis 1*, 2007 WL 2051446, at *4.  The trial court denied Petitioner's pretrial motion to sever this count. (ECF No. 36-1, at 23–26.)  But later, finding insufficient evidence to support that charge at trial, the trial court entered a judgment of acquittal as to criminal impersonation at the close of the state's case, and the charge was not included in the parties' closing arguments or the jury instructions. *Id.*

Petitioner raised the claim on direct appeal,[5] but the state appellate court found any error to be "clearly harmless," citing the admissibility of evidence of attempts to evade arrest and the "overwhelming evidence supporting Defendant's convictions of the other charges."  *Id.*, at *4, 5.

_____

[5] The Court notes that Petitioner's brief to the state court presented the issue solely as a matter of state law, with a vague reference to a violation of his "due process right to a fair trial." (ECF No. 1-2, at 9–11.)  Nevertheless, Respondent has not asserted that this claim is defaulted, and the Court declines to raise the issue *sua sponte*. *See Moore v. Steward*, 948 F. Supp. 2d 826, 839 (W.D. Tenn. 2013) (declining to raise default *sua sponte* where doing so would require giving petitioner the opportunity to respond and claim failed on the merits anyway).

"[W]hen a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable." *Fry v. Pliler*, 551 U.S. 112, 119 (2007). Moreover, a district court reviewing a § 2254 petition may grant relief even for constitutional error only if such error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

In this case, Petitioner does not establish any prejudicial error. He cites *Zafiro v. United States*, 506 U.S. 534, 538 (1993), which concerns severance on the basis of mutually antagonistic or irreconcilable defenses among co-defendants and does not provide any "clearly established federal law" regarding severance of multiple counts against the same defendant. But even assuming the failure to sever constituted error, it did not have a substantial and injurious influence on the jury's verdict in light of the two eye-witness accounts implicating Petitioner in the crime. Petitioner is not entitled to relief on this claim.

### B.    Claim 2: Testimony about Defendant's Companion

Petitioner asserts that the trial court erred in allowing testimony that he was arrested while in the company of an individual who was "wanted" in another jurisdiction. (ECF No. 1, at 7.) The testimony at trial was that a Crime Stoppers tip about the whereabouts of "another individual that another department had an interest in" led to surveillance that ultimately led to Petitioner's apprehension. (ECF 36-4, at 115– 21.)

Respondent argues that this claim is procedurally defaulted because Petitioner asserted it to the state court solely as a matter of state law and did not raise a federal constitutional claim in connection with it. (ECF 60, at 16–17.) In his brief to the state court of criminal appeals, Petitioner complained that admission of the testimony about his connection with the other individual violated

specific Tennessee Rules of Evidence. (ECF 1-2, at 25.)  He did not allege that the admission of the testimony violated any federal rights. (*Id.*)  Because Petitioner never presented his federal claim to the state courts and is now barred by applicable state limitations from doing so, *see* Tenn. Code Ann. § 40-3-102 and -117, the claim is deemed exhausted but is procedurally barred from federal habeas review. *See Coleman*, 501 U.S. at 752-53.

## C.      Claim 3: Confrontation Clause

Petitioner claims that the trial court violated his due process right to confront a witness by refusing to allow him to question witness Eula Beasley about criminal charges against him that were dismissed shortly before he testified. (ECF No. 1, at 9.)  He presented this as a Sixth Amendment violation to the state court of criminal appeals, which analyzed the claim as follows:

> The trial court conducted a hearing outside the presence of the jury to determine which of Mr. Beasley's prior convictions could be used by defense counsel to impeach Mr. Beasley's credibility.  During the hearing, defense counsel made an offer of proof concerning certain charges against Mr. Beasley which had been incurred and dismissed after Defendant was indicted on the current charges.  These charges, all misdemeanors, included four assault charges, one criminal trespass charge, and two charges of vandalism of property valued at less than $500.00.

> At the hearing, Defendant conceded that these charges were not admissible under Rule 609 of the Tennessee Rules of Evidence but argued that the evidence was admissible under Rule 616 to show the witness's bias.  *See* Tenn. R. Evid. 609 and 616.  Defendant contended that the jury could infer that the misdemeanor charges were dismissed in exchange for Mr. Beasley's testimony.  The State acknowledged at the hearing that defense counsel could establish the existence of any promises of leniency by simply asking Mr. Beasley if any such promises had been made, but defense counsel did not do so.  The trial court found the evidence inadmissible under rule 616 because defense counsel failed to offer any proof that the dismissal of the charges was in exchange for Mr. Beasley's testimony.

> "A defendant's right to examine a witness to impeach his or her credibility or to establish that he witness is biased includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness." *State v. Rice*, 184 S.W.3d 646, 670 (Tenn. 2006) (citing *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001)).  The exposure of a

witness's motivation in testifying is a proper and important function of cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79 (1986); *see also* Tenn. R. Evid. 616 ("A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness."). "An undue restriction of this right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution." *Sayles*, 49 S.W.3d at 279 (citing [*State v.*] *Smith*, 893 S.W.2d [908,] at 924 [(Tenn. 1995)]; *State v. Black*, 815 S.W.2d 166, 177 (Tenn. 1991)).

We conclude that the trial court erred by not allowing Defendant to cross-examine Mr. Beasley about whether the charges were dismissed in exchange for him [sic] being a cooperative witness for the State. *Rice*, 146 S.W.3d at 670. However, in light of the thorough cross-examination and the extensive impeaching evidence allowed, we hold that the error was harmless. Tenn. R. Crim. P. 52(a). Defendant is not entitled to relief on this issue.

*Davis 1*, 2007 WL 2051446, at *13-14.

The state court thus accurately summarized the applicable law and correctly concluded that exclusion of the cross-examination material in question was error. That does not end the analysis, however, because "the denial of the opportunity to cross-examine an adverse witness does not fit within the limited category of constitutional errors that are deemed prejudicial in every case." *Van Arsdall*, 475 U.S. at 682. The factors in the harmless error analysis applicable to Confrontation Clause violations "include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*

Beasley's testimony in this case was important, but it was corroborated in all material respects by the testimony of another eyewitness. The prosecution's case against Petitioner would have been strong based on Boone's account of the murder, even if Beasley had not testified.

Moreover, although the trial court erred in preventing the cross-examination of Beasley for bias based on the recently dismissed charges, it did allow extensive impeachment along other lines. Specifically, defense counsel was able to cross-examine Beasley about the fact that he was smoking crack cocaine the day of the incident (ECF 36-3, at 152); that he had previously pleaded guilty to assaulting his wife despite testifying that he had never been violent (*id.* at 171); that he had multiple prior felony and misdemeanor convictions (*id.* at 172–75); and that at the time of his testimony he was being held on a material witness bond from which he would only be released after testifying. (*Id.* at 181–82.)

Under these circumstances, the state court's finding of harmless error was not an objectively unreasonable application of federal law.

### D.     Claim 4: Refreshed Recollection

Petitioner asserts that the trial court "erred in permitting the state to use a police report to refresh the recollection of its witness, Eula Beasley, in violation of Rule 612 of the Tennessee Rules of Evidence." (ECF No. 1, at 12.)

To the extent that petitioner bases this claim on state law, it is not cognizable on federal habeas review. *See* 28 U.S.C. § 2254(a) ("[A] district court shall entertain an application for a writ of habeas corpus . . . only on the ground that he is in custody *in violation of the Constitution or laws or treaties of the United States*." (emphasis added))*; Wilson v. Parker*, 515 F.3d 682, 705 (6th Cir. 2008) ("[a] federal court cannot issue a writ of habeas corpus 'on the basis of a perceived error of state law.'" (quoting *Pulley v. Harris*, 465 U.S. 37, 41 (1984)).

To the extent that this claim could be construed to sound in federal law,[6] it is procedurally defaulted and not subject to review. Petitioner failed to present this claim in state court as a federal claim (*see* ECF 1-2, at 27–28), and is now barred by state law from doing so. Petitioner is not entitled to relief on the basis of this claim.

## E.  Claim 5: Excluded Evidence

Petitioner alleges that the trial court erred by refusing to allow him to introduce evidence of a prior false report by the officer who wrote a report used at trial to refresh the recollection of a witness. (ECF No. 1, at 14.)

In raising this claim on direct appeal, Petitioner cited only Rule 806 of the Tennessee Rules of Evidence, and did not expressly raise any federal claim. (ECF 1-2, at 16–17; ECF 1-4, at 42–43.) Although he concluded that "exclusion of this evidence violated the defendant's right to a fair trial and due process of law" (ECF 1-2, at 17; ECF 1-4, at 43), the Sixth Circuit has been very clear that "[g]eneral allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present' claims that specific constitutional rights were violated." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).

This claim has not been fairly presented to the state courts and is accordingly procedurally defaulted.

## F.  Claim 6: Excited Utterance

---

[6] The petition alleges that the state court's rejection of his claim constitutes an unreasonable application of clearly established federal law as set forth in *Dowling v. United States*, 493 U.S. 342, 352 (1990). *Dowling* does not support Petitioner's claim, and does not involve refreshed recollection of a witness. *Id.*

The petition alleges that the trial court erred in refusing to allow defense counsel to cross-examine a detective about an excited utterance made to him by a woman who was at the scene of the crime. (ECF No. 1, at 16.) In support of his argument, Petitioner cites a list of Supreme Court cases that do not involve exclusion of excited utterances, and incorporates his state appellate briefs.

Again, Petitioner's state court briefs reveal that he did not raise this claim as a violation of federal law in state court. He relied exclusively on Tennessee Rule of Evidence 803(2) and state court opinions construing it. (ECF 1-2, at 29–31; ECF 1-4, at 43–45.) His vague conclusion that exclusion of the evidence denied him "his right to a fair trial" (ECF 1-4, at 45) was not sufficient to "fairly present" a federal constitutional claim to the state courts, and his claim is thus procedurally defaulted. *See McMeans*, 228 F.3d at 681.

## G. Claim 7: Insufficient Evidence

Petitioner claims that there was insufficient evidence to support his convictions for assault, first-degree murder or attempted second-degree murder. (ECF No. 1, at 18.) Respondent does not dispute that this claim was properly exhausted on direct appeal.

The Tennessee Court of Criminal Appeals engaged in a lengthy and detailed analysis of this issue. Because the state court's factual conclusions are presumed to be correct, its analysis is set forth here in its entirety:

> Defendant does not challenge the sufficiency of the evidence supporting his assault conviction.[7] Defendant argues on appeal that the evidence was insufficient to support his convictions of first degree premeditated murder and attempted second degree murder. Defendant contends that the evidence failed to establish that he knew anyone

---

[7] This statement about the scope of Petitioner's claim was incorrect, as he did include his assault conviction in his insufficient evidence claim. (ECF No. 1-2, at 31.) Because the evidence relied upon by the state court was clearly sufficient to support the conviction for simple assault, *see* Tenn. Code Ann. §39-13-101 (defining assault), this error is inconsequential.

was in the apartment when he discharged his gun, and thus the State failed to prove that Defendant acted with the requisite criminal intent. Defendant further argues that the forensic evidence suggests that a second shooter was inside Ms. Phelps' apartment, and the State thus failed to prove beyond a reasonable doubt the it was Defendant who committed the offenses against Ms. Phelps and Mr. Beasley.

In reviewing Defendant's challenge to the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Accordingly, in a bench trial, the trial judge, as the trier of fact, must resolve all questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence. *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Ct. Crim. App. 1998). The trial judge's verdict carries the same weight as a jury verdict. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn.Crim.App.1990).

Defendant was convicted of the premeditated murder of Ms. Phelps and the attempted second degree murder of Mr. Beasley. As relevant here, first degree murder is defined as "a premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). The offense of second degree murder is defined as "[a] knowing killing of another." *Id.* § 39-13-210(a)(1). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense ... [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.* § 39-12-101(a)(3). "Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense." *Id.* § 39-12-101(b).

A premeditated act is one "done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). A finding of "premeditation" requires that:

> the intent to kill must [be] formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered

in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.*

The element of premeditation is a question of fact to be resolved by the jury and may be established by proof of the circumstances surrounding the killing. *State v. Suttles*, 30 S.W.3d 252, 260 (Tenn. 2000). Circumstances from which premeditation may be inferred include the defendant's use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by a defendant of an intent to kill; the defendant's procurement of a weapon; a defendant's preparations prior to a killing for concealment of the crime; and calmness immediately after the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997).

The killing must be intentional as well as premeditated. "'Intentional' refers to a person who acts intentionally with respect to ... a result of the [person's] conduct when it is the person's conscious objective or desire to ... cause the result." T.C.A. § 39-11-302(a).

Citing *State v. Wilson*, 924 S.W.2d 648 (Tenn. 1996), Defendant argues that the State failed to prove that he acted with the requisite criminal intent. In *Wilson*, our supreme court held that the evidence was insufficient to support an aggravated assault conviction because there was no basis for finding that the defendant, who fired two shots into a residence after having an angry, verbal confrontation with the owner of the residence two days earlier, knew that the residence was occupied. Thus, the State failed to prove that the defendant acted knowingly or intentionally in causing the victims to reasonably fear imminent bodily injury. *Id.* at 651.

Viewing the evidence in a light most favorable to the State, however, the facts presented in *Wilson* are clearly distinguishable from those in the case sub judice. Both Mr. Beasley and Mr. Boone testified that Defendant approached Ms. Phelps on the sidewalk and slapped her across the face after engaging in an angry verbal confrontation. Although Defendant's exact words varied according to the trial testimony, Mr. Beasley and Mr. Boone testified that Defendant threatened to shoot at Ms. Phelps' residence and warned Ms. Phelps not to be there when he came back. Mr. Boone said that he was standing outside Ms. Phelps' apartment and could see Ms. Phelps standing in front of the living room window. Mr. Beasley and Mr. Boone both observed Defendant return to Ms. Phelps' apartment a few minutes after the confrontation on the sidewalk. Mr. Boone said that Defendant stood beside him, pulled out a gun and shot into the open living room window, then sprayed the front of the apartment with bullets from right to left. Mr. Boone stated that after the shooting, Defendant left the crime scene and drove off in his car. Based on our review, we conclude that the evidence was sufficient to support a finding that Defendant acted with the requisite *mens rea* to cause the result of his conduct.

Defendant contends that the forensic evidence "strongly suggests" the possibility that there was a second shooter inside the house. Defendant bases this theory on the fact

that Officer Kirby could not testify with certainty that the lead bullet core found in front of the back bedroom window was fired from outside the apartment. Because the lead bullet core found in the living room and the lead bullet core found in the back bedroom were fired from the same gun, Defendant surmises that these bullets were fired from inside the house.

This Court may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002) (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *Liakas v. State*, 286 S.W.2d 856, 859 (1956)). Viewing the evidence in a light most favorable to the State, Officer Kirby testified that all of the shell casings found in the grassy area in front of Ms. Phelps' apartment were fired from the same gun. Mr. Boone and Mr. Beasley testified that Defendant shot through the open living room window where Ms. Phelps was standing and then through the front bedroom window. Mr. Beasley was standing by the open front door in the zone of danger when Defendant commenced firing. There was no evidence that anyone inside Ms. Phelps' apartment was armed at the time of the shooting.

Based on our review of the record, we conclude that a rational trier of fact could find beyond a reasonable doubt that Defendant was guilty of the first degree premeditated murder of Ms. Phelps and the attempted second degree murder of Mr. Beasley. Defendant is not entitled to relief on this issue.

*Davis 1*, 2007 WL 2051446, at *9–12.

The right to due process guaranteed by the Constitution ensures that no person will be made to suffer the onus of a criminal conviction except upon sufficient proof. Sufficient proof has been defined as the "evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). When weighing the sufficiency of the evidence to support a criminal conviction, the Court must view the evidence in a light most favorable to the prosecution. *Id.* at 319.

The state court appropriately employed this standard above in its review. In applying it to the facts, it reasonably found that Petitioner's convictions were adequately supported by the testimony of two witnesses who saw Petitioner slap the victim across the face and threaten the victim, and saw

him fulfill that threat minutes later by shooting into the living room window where the victim was visibly standing, with Beasley nearby in the zone of danger.

The Court does not find that the disposition of this claim by the state court was in any way contrary to, or an unreasonable application of federal law. Accordingly, it is without merit and will be DISMISSED.

### H. Claim 8: Sequential Consideration Instruction

Petitioner alleges that the trial court's instruction on sequential consideration of lesser-included offenses unconstitutionally dictated the method of the jury's deliberations. (ECF No. 1, at 20.)

On the count of first-degree murder of Phelps, the trial court instructed the jury with regard to its consideration of that offense, then charged in relevant part that:

> On the other hand, if you find the defendant not guilty of First Degree Premeditated Murder of Susan Phelps, as charged in Count Two of the indictment, or if you have a reasonable doubt thereof, then you must acquit him, and your verdict must be "not guilty," as to this offense. You must then consider the lesser included offense of Attempted First Degree Murder.

(ECF No. 36-2, at 24.) That instruction was followed by sequential consideration instructions for the lesser included offenses for that count: attempted first degree murder, second degree murder, attempted second degree murder, voluntary manslaughter, aggravated assault, attempted voluntary manslaughter, reckless homicide, criminally negligent homicide, assault and misdemeanor reckless endangerment. (*Id.* at 24–47.) Next, the trial court similarly instructed the jury regarding the charge of attempted first degree murder of Eula Beasley and the sequential consideration of each lesser included offense for that count. (*Id.* at 48–58.)

Petitioner argued on direct appeal that this "acquittal-first" sequencing of the jury instructions, whereby jurors are not to consider a lesser included offense until they have acquitted a defendant of the original offense, violated state law and violated his right to a jury trial by impermissibly intruding on the independence of jury deliberations. (ECF No. 36-12, at 20–28.)  In the course of a lengthy analysis rejecting his claim on state law grounds, the Tennessee Supreme Court noted that:

> Additionally, the Defendant makes a reference to *Sullivan v. Louisiana*, 508 U.S. 275 (1993), as supporting the notion that an acquittal-first jury instruction offends the federal constitution's Sixth Amendment right to trial by jury.  The *Sullivan* case does not stand for the proposition that acquittal-first jury instructions violate the United States Constitution and we have found no United States Supreme Court decision that contains such a holding.  We therefore reject the Defendant's argument to this effect.

*Davis 2*, 266 S.W.3d at 905 n.9.

The state court's ruling in this regard was clearly correct.  *Sullivan* does not establish any constitutional prohibition against "acquittal-first" sequencing of lesser included offense instructions, and neither do any of the federal cases cited in the current petition.  To the contrary, the Supreme Court has instructed that not even a prohibition on "acquittal-first" sequencing of capital sentencing deliberations is "clearly established" by its precedent. *See Smith v. Spisak*, 558 U.S. 139, 149 (2010). Even more recently, it has ruled on a case in which Arkansas' "acquittal-first" instructions for consideration of lesser included offenses provided the foundation for the petitioner's Double Jeopardy claim, and described the instruction scheme without criticism or concern. *See Blueford v. Arkansas*, 132 S. Ct. 2044 (2012) (holding that retrial for capital murder did not violate Double Jeopardy Clause where previous jury deadlocked on a lesser included offense during "acquittal-first" deliberations).

The state court's decision was therefore not contrary to or an unreasonable application of any clearly established federal law. Petitioner's claim is without merit.

## I.     Claim 9: Reckless Endangerment

Petitioner claims that the trial court violated his right to trial by jury on all lesser included offenses by failing to charge the jury on the lesser included offense of reckless endangerment. (ECF No. 1, at 22.)

In support of this claim on direct appeal, Petitioner cited *Beck v. Alabama*, 447 U.S. 625 (1980), in which the Supreme Court held that the Constitution requires that juries in capital cases be instructed on all lesser included offenses that could be supported by the facts of a case. The *Beck* decision was based in part on the Court's holding that the risk of unwarranted conviction due to the absence of the option of conviction for a lesser offense "cannot be tolerated in a case in which the defendant's life is at stake" and that "there is a significant constitutional difference between the death penalty and lesser punishments." *Id.* at 637. This holding does not clearly establish that defendants in non-capital trials are constitutionally entitled to instruction on every lesser included offense, *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001), and Petitioner has not cited any Supreme Court case that does establish such a rule.

Moreover, even the application of such a rule to Petitioner's case would not help him prevail, because the state court has determined that the offense about which Petitioner claims the jury should have been instructed is not, as a matter of state law, a lesser included offense of the crimes for which he was charged. *See Davis 1*, 2007 WL 2051446, at *19 (citing *State v. Rush*, 50 S.W.3d 424, 431 (Tenn. 2001)).

Petitioner's claim fails because the state court's determination was not contrary to or an unreasonable application of clearly established federal law.

**J.      Claims 10 and 21: Reasonable Doubt Instruction**

Petitioner alleges that the trial court unconstitutionally instructed the jury to determine whether there was reasonable doubt about his innocence rather than reasonable doubt about his guilt. (ECF No. 1, at 24; ECF No. 48, at 1, ¶ 3.)

The instruction about which Petitioner complains is quoted above in section H. In this claim his complaint is that the phrase "reasonable doubt thereof" could have been construed to mean reasonable doubt about his innocence rather than reasonable doubt about his guilt[8] and therefore requires reversal under *Sullivan v. Louisiana*, 508 U.S. 275 (1993). (*See* ECF 36-8, at 40–41.) The state court disagreed, and further found that the jury was not misled about the concept of reasonable doubt by the instructions as a whole, which included a clear and correct instruction on the presumption of innocence that "is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty." *See Davis 1*, 2007 WL 2051446, at **20–21.

*Sullivan* provides no support for Petitioner's claim. The holding of *Sullivan* is that a reasonable doubt instruction identical to the one found unconstitutional in *Cage v. Louisiana*, 498 U.S. 39 (1990) – which defined reasonable doubt as "grave uncertainty," *id.* at 40 – requires reversal without being subject to harmless-error analysis. *Sullivan*, 508 U.S. at 280–82. In this case,

---

[8] The Court notes that regardless of whether the required reasonable doubt was construed to be about the Petitioner's guilt or innocence, the instruction required the jury to *acquit* based on such doubt; accordingly the only possible consequence of any confusion would be to Petitioner's benefit in making acquittal of the offense under consideration more likely.

Petitioner does not allege that the trial court's *definition* of reasonable doubt[9] was similar to the definition at issue in *Cage* and *Sullivan* or was otherwise infirm. He simply complains that the court's later use of the term was ambiguous in context, and is unable to cite any federal case holding a similar instruction unconstitutional.

Viewing the phrase at issue in the context of the instructions as a whole, the Court does not find "a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). The state court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law, and the Petitioner's claim fails.

---

[9] The trial court defined reasonable doubt as follows:

Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a doubt that may arise from possibility. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every proposition of proof requisite to constitute the offense. If you find the state has not proven every element of the offense beyond a reasonable doubt, then you should find the defendant not guilty.

(ECF No. 36-2, at 8.)

### K. Claim 11: Prosecutor's Closing Argument

Petitioner next claims that the prosecutor at trial misstated the evidence and denigrated defense counsel in his closing argument. (ECF No. 1, at 26.)

#### 1. Misstated Evidence

During the trial, an expert in firearm and tool mark identification testified that the spent ammunition found at the murder scene was all .40 caliber Smith and Wesson and consisted of outer cartridge cases, metal jackets – some with the lead core still inside and others that had been stripped from the lead core – and a naked lead core. (ECF No. 36-4, at 78–79, 94.) He was able to determine from firing pin markings that all of the outer cartridge casings recovered from the scene were fired from the same semi-automatic handgun, and that the gun in question was either a Glock or a Smith and Wesson Sigma Series. (*Id.* at 80–81.) He was also able to determine from rifle markings that all of the metal jackets recovered were fired by the same Smith and Wesson Sigma Series firearm. (*Id.* at 90–91.) Because no gun was recovered in the case for him to test fire, however, he could not scientifically confirm that the cartridge casings and the metal jackets came from the same gun. (*Id.* at 93.) And because separation of the metal jacket from a bullet's lead core after firing leaves the core with no individual markings for identification, he was unable to reach any conclusions about the bullet core recovered by the medical examiner. (*Id.* at 90.) Specifically, he testified that it is not scientifically possible to determine whether a naked lead core, like the one recovered from the victim's head, came from any particular empty metal jacket. (*Id.* at 91–92.)

Petitioner complains that the following statement by the prosecutor during closing argument misstated the evidence:

> This number nine is a jacket. And remember when the Officer was testifying when you shoot somebody in the head or in the body sometimes a piece of it, the slug part goes into the head and then the jacket part stays on the outside of the body. This is where they found her (indicating) so the jacket part came off, either in her hair or in her face. The slug went in the inside and killed her. That jacket matches the slug that was in her head.

(ECF No. 36-4, at 189; ECF 36-8, at 41.)

After comparing the evidence to the prosecutor's argument, the state court rejected

Petitioner's claim:

> Based on the foregoing and our review of the record, we conclude that the prosecutor did not intentionally misstate the evidence. The prosecutor drew a reasonable inference about the relationship between the bullet jacket found next to the victim and the bullet core retrieved from her body in response to defense counsel's closing argument [that a second shooter inside the apartment fired the shot that killed the victim]. Defendant is not entitled to relief on this issue.

*Davis 1*, 2007 WL 2051446, at *22.

Once again, the cases cited by Petitioner do not demonstrate that the state court's conclusion was contrary to or an unreasonable application of clearly established federal law. *Smith v. Phillips*, 455 U.S. 209 (1982), which Petitioner cited on direct appeal (ECF No. 36-8, at 41), involved a prosecutor's suppression of evidence of potential bias on the part of a juror and is irrelevant to Petitioner's case. *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), on which he relies in the current petition, establishes that allegedly improper argument by a prosecutor does not warrant habeas corpus relief where the comment did not "by itself so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 643. This case was not so infected.

Prosecutors "must be given leeway to argue reasonable inferences from the evidence." *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996)). In his comments quoted above, the prosecutor was obviously theorizing about how

the lead bullet wound up in the victim's head with an empty metal jacket loose nearby, and her argument about their "match[ing]" was based on logic rather than a reference to the scientific evidence. The prosecutor certainly could have more clearly qualified her comments as theory or assumption. *See id.* at 536 ( finding that prosecutor's comments did not mislead jury where they were qualified with "you would have to assume" and "I speculate"). However, even if the failure to do so rendered her argument improper, it would not rise to the level necessary to warrant habeas relief where the scientific evidence was too clear for the jury to be misled by the closing argument, and the other evidence in the case overwhelmingly proved the Petitioner's guilt. *See id.*

Petitioner is not entitled to relief on this claim.

### 2.    Denigrating Opposing Counsel

Petitioner complained on direct appeal that the prosecutor's arguments that "defense counsel wants to pretend" a certain fact, that "counsel tried to get [a witness] to say," and that sometimes when counsel spoke "I don't know what she's talking about," amounted to misconduct requiring a new trial. (ECF No. 36-8, at 41–42.)

The Tennessee Court of Criminal Appeals considered this claim waived, citing state case law for the proposition that "[i]t is well settled that without a contemporaneous objection to a prosecutor's statements, the error is waived." *Davis 1*, 2007 WL 2051446, at *22. The United States Supreme Court has recognized that a state's "contemporaneous objection rule served strong state interests in the finality of its criminal litigation," and has imposed a "presumption against federal habeas review of claims defaulted in state court for failure to object at trial" except where the petitioner establishes cause and prejudice. *Coleman v. Thompson*, 501 U.S. 722, 746–47 (1991).

Petitioner has made no effort to satisfy that cause and prejudice standard, and this claim is accordingly barred from review by procedural default.

## L.     Claim 12: Sentencing

The petition asserts that the trial court erred by relying on the presentence investigation report to enhance the defendant's sentence and by imposing consecutive sentences. (ECF No. 1, at 28.)

### 1.     Enhancement

Specifically, Petitioner complained on direct appeal that his prior class C felony drug convictions classified him as a Range II multiple offender, leading to a sentencing range of 12 to 20 years for his attempted second degree murder conviction, and that the trial court's reliance on facts not found by the jury to enhance his sentence on that count from 12 to 15 years violated his right to trial by jury. (ECF No. 36-12, at 48–49.)

The state intermediate appellate court ruled on this claim in essence as follows:

The trial court found the presence of two enhancement factors based on Defendant's prior criminal convictions and his previous unwillingness to comply with the conditions of a sentence involving release into the community. In *Blakely* [*v. Washington*, 542 U.S. 296 (2004)], the United States Supreme Court concluded that other than a defendant's prior convictions, the "'statutory maximum' for *Apprendi* [*v. New Jersey*, 530 U.S. 466 (2000),] purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." . . .. [We] conclude that the trial court's application of enhancement factor (9) [for unwillingness to comply] violated the dictates of *Blakely*.

\*     \*     \*

[T]he application of enhancement factor (2), which was based upon the appellant's numerous prior convictions, does not violate *Blakely*. Moreover, given the appellant's extensive criminal history, we conclude that even if the application of enhancement factor (9) was error, the application of enhancement factor (2) was entitled to sufficient weight and warrants the fifteen-year sentence. Defendant is not entitled to relief on this issue.

*Davis 1*, 2007 WL 2051446, at *25 (Tennessee Code citations omitted). The state supreme court affirmed:

> We agree that the trial court erred when it relied on the Defendant's previous unwillingness to comply with the conditions of a sentence involving release into the community because this contention was not put before the jury or admitted by the Defendant. Nevertheless, we agree with the Court of Criminal Appeals that the Defendant's prior criminal convictions are sufficient in and of themselves to support the Defendant's moderately enhanced sentence for attempted second degree murder. The Defendant is therefore entitled to no relief as to this issue.

*Davis 2*, 266 S.W.3d at 909.

Petitioner's presentence report indicated that he had two Class C felony convictions for possession of cocaine, approximately nineteen misdemeanor convictions and numerous traffic violations. *Davis 1*, 2007 WL 2051446, at *23. The state courts applied the appropriate federal standard to the case, and this Court cannot conclude, based on these facts, that their determination that Petitioner's history of convictions alone supported a 3 year enhancement was unreasonable. *See Washington v. Recuenco*, 548 U.S. 212, 221–22 (2006) (holding that *Blakely* errors are subject to harmless-error analysis).

Petitioner is not entitled to habeas relief on this claim.

2.      Consecutive Sentences

As the state supreme court observed, the trial court imposed a consecutive sentence for Petitioner's attempted second degree murder sentence on the basis of finding two statutory criteria: "(1) that he is 'a professional criminal who has knowingly devoted [his] life to criminal acts as a major source of livelihood'; and (2) that he is 'an offender whose record of criminal activity is extensive.'" *Davis 2*, 266 S.W.3d at 909 (statutory citations omitted). Petitioner complains that the

trial court's findings constituted judicially determined facts and value judgments, and were therefore unconstitutional. (ECF 36-12, at 38–39.)

To the extent this claim is based on *Blakely*, it fails immediately. The United States Supreme Court has expressly held that *Blakely* and *Apprendi* do not apply to consecutive sentencing determinations. *Oregon v. Ice*, 555 U.S. 160 (2009).

Moreover, the state supreme court reasonably held that the trial court did not err in imposing consecutive sentences because "the length of the Defendant's effective sentence is 'justly deserved in relation to the seriousness of the offense[s],' and is 'no greater than that deserved for the offense[s] committed." *Davis 2*, 266 at 909.

Petitioner is not entitled to relief on this claim.

### M.        Claim 13: Defendant's Statement

#### 1.        *Miranda* Violation

Petitioner claims that the trial court erred in denying his motion to suppress the statement he made to a police detective at the time of his arrest, in violation of his Fifth Amendment rights as established in *Miranda v. Arizona*, 384 U.S. 436 (1966). (ECF No. 1, at 30.) In *Miranda*, the Supreme Court held that an individual who is in police custody

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

*Id.* at 479–80.

> Detective Dunaway testified at trial about that statement:
>
> Well, he asked me, he said what's this about. And I said, well, there is a criminal homicide warrant on you, but I know nothing about the case, which I really didn't know anything about the case. And I said, but the detective working the case is not here right now, he's at home. But if you want to talk to him, I'll call him in. He said what is this about? And I said, it's a murder warrant, but I don't know anything about the dude that you killed. And he said, it wasn't a dude, it was a lady. And at that point I didn't know if it was a dude or a lady. But then he said he would agree to talk to Detective Achord.

(ECF No. 36-4, at 125–126.)

Prior to allowing this testimony, the trial court held a suppression hearing at which Dunaway testified about his 5-minute conversation with Petitioner and acknowledged that he did not advise Petitioner of his *Miranda* rights. *Davis 1*, 2007 WL 2051446, at *5. Dunaway testified "that he did not have any intention of eliciting information from Defendant because he did not know anything about the case." *Id.* Finding that the conversation in question was not the functional equivalent of custodial interrogation and that Petitioner's comment was made voluntarily, the trial court denied the motion to suppress and allowed Dunaway's testimony. *Id.* at *6.

> The state appellate court affirmed:
>
> It is clear from the record that the Defendant's statement to Detective Dunaway was made while Defendant was in custody and after his Sixth Amendment rights had attached. Detective Dunaway testified that he did not inform Defendant of his *Miranda* rights prior to speaking with him. Relying of [sic] *Rhode Island v. Innis*, 446 U.S. 291 (1980), Defendant contends that Detective Dunaway knew or should have known that his comments to Defendant would produce an incriminating response.
>
> In *Innis*, the Supreme Court concluded:
>
> > that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions

on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 301.

The determination of whether Defendant's statement was made in response to an improper police interrogation involves questions of both fact and law, which this court reviews *de novo*. *See generally State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999) (citing *Harries v. State*, 958 S.W.2d 799, 802 (Tenn. Crim. App. 1997) (cases that involve mixed questions of law and fact are subject to *de novo* review)); State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997).

This Court has previously observed that "[t]here is a difference between police initiated custodial interrogation and communications, exchanges, or conversations initiated by the accused himself." *State v. Land*, 34 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (citing *Edwards v. Arizona*, 451 U.S. 477 (1981)). There is no constitutional protection from statements volunteered by the accused. *Edwards*, 451 U.S. at 484. "At the very least, the police must have asked a question that was 'probing, accusatory, or likely to elicit an incriminating response' before a court may conclude that there was interrogation." *Land*, 34 S.W.3d at 524.

As this Court observed in *Land*,

> [s]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. *Innis*, 446 U.S. at 301. Additionally, where a defendant makes a statement without being questioned or pressured by a government agent, the statement is admissible, if the statement was freely and voluntarily made by the defendant. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986); *Michigan v. Tucker*, 417 U.S. 433, 441 (1974).

*Id.* at 524-25.

Detective Dunaway testified at the suppression hearing that he was on duty when Defendant was brought in for booking. Detective Dunaway printed out a current photograph of Defendant and carried it with him to the booking office to identify Defendant, whom the arresting officers believed was using a false name. Detective Dunaway did not expressly question Defendant about the crime; he merely responded to Defendant's inquiry concerning the reason why he was arrested. Nor can it be said that Detective Dunaway should have known that this brief exchange with Defendant was reasonably likely to elicit an incriminating response from Defendant or that Detective Dunaway even expected any response to his conversation.

Based on our review, we conclude that Defendant's statement was not the product of an unconstitutional custodial interrogation. Accordingly, we conclude that the trial court did not err in denying Defendant's motion to suppress on this basis. Defendant is not entitled to relief on this issue.

*Id.* at *8–9.

Petitioner obviously disagrees with the state court's finding that his conversation with Dunaway was not the functional equivalent of an interrogation. That disagreement, however, does not entitle Petitioner to relief. This Court is not at liberty to conduct its own independent analysis of the issue of whether an interrogation occurred. Rather, under the AEDPA's "highly deferential" standard of review, which "demands that state-court decisions be given the benefit of the doubt," *Bell v. Cone*, 543 U.S. 447, 455 (2005) (quotations omitted), the Court must determine whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding.

The state courts have credited Dunaway's testimony that he did not know anything about the Petitioner's case and did not have any intention to elicit any information from him when he told Petitioner that he did not know anything about the man he was accused of killing. *See Davis 1*, 2007 WL 2051446, at *5. The United States Supreme Court reached a similar conclusion in *Innis*:

> [t]he case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have known that it was reasonably likely that [the suspect] would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

*Innis*, 446 U.S. at 302-03.

The court articulated the correct legal standards from *Miranda* and *Innis*, and reasonably applied them to the facts to conclude that Petitioner's conversation with Dunaway, who had no involvement in the investigation or arrest of Petitioner, was not an interrogation or its equivalent. Petitioner is not entitled to relief on the basis of his *Miranda* claim.

### 2.    Arrest Warrant

Petitioner has also asserted that the statement should have been suppressed as the fruit of an illegal arrest under *Spinelli v. United States*, 393 U.S. 410 (1969) and *Wong Sun v. United States*, 371 U.S. 471 (1963). (ECF No. 36-8, at 11–12.)  Specifically, he claims that "[a] factually sufficient basis for the probable cause determination must appear within the affidavit of complaint," and that the affidavit of complaint in support of the arrest warrant in this case was fatally defective for failure to set forth the basis of the complaining detective's knowledge and the credibility of the informant. (*Id.*)

The state court rejected Petitioner's claim:

The affidavit attached to the warrant for Defendant's arrest stated:

> On [August 21, 2003], the victim was at 321 McMillan Street, Nashville, Tennessee. She was approached by the accused. He accused her of stealing his property, which he had left in an abandoned apartment. He slapped the victim, and then threatened to return and kill everyone. The accused left. He returned a short time later, armed with a semiautomatic handgun. He pointed the weapon toward the victim and began firing. The victim sustained a gunshot wound to the face. She was transported to Vanderbilt Emergency Room, where she was pronounced deceased.

Arrest warrants may only issue upon a showing of probable cause. *State v. Lewis*, 36 S.W.3d 88, 97 (Tenn. Crim. App. 2000) (citations omitted); *State v. Tays*, 836 S.W.2d 596, 600 (Tenn. Crim. App. 1992). Rule 4(a), Tenn. R. Crim. P., provides in pertinent part:

> Issuance of Warrant or Summons.-If the affidavit of complaint and any supporting affidavits filed with it establish that there is probable cause to believe that an offense has been committed and that the defendant has committed it, the magistrate or clerk shall issue an arrest warrant to an officer authorized by law to execute it.... Before ruling on a request for a warrant, the magistrate or clerk may examine under oath the complainant and any witnesses the complainant produces.

The magistrate's or clerk's finding of probable cause "shall be based on evidence which may be hearsay in whole or in part provided there is a substantial basis to believe (1) the source of the hearsay to be credible; and (2) there is a factual basis for the information furnished." Tenn. R. Crim. P. 4(b). Probable cause is "a reasonable grounds for suspicion, supported by circumstances indicative of an illegal act." *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998) (citing *Lea v. State*, 181 S.W.2d 351, 352 (1944)).

Before a valid arrest warrant can issue, the judicial officer issuing the warrant must be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant. *State v. Carter*, 160 S.W.3d 526, 533 (Tenn. 2005). A factually sufficient basis for the probable cause judgment must appear within the affidavit of the complaint. If hearsay evidence is relied upon, the basis for the credibility of both the informant and the informant's information must also appear in the affidavit. *Spinelli v. U.S.*, 393 U.S. 410 (1969). Citizens who witness crimes or relevant events, however, are presumed to be reliable for probable cause purposes. *See State v. Williams*, 193 S.W.3d 502, 507 (Tenn. 2006) (citing *State v. Melson*, 638 S.W.2d 342, 354-56 (Tenn. 1982)); *State v. Smith*, 867 S.W.2d 343, 346-48 (Tenn. Crim. App. 1993).

The affidavit at issue does not identify the source of the affiant's knowledge although it may reasonably be inferred that the information was based on Detective Achord's investigation of the crime. Nonetheless, despite the affidavit's inartful draftsmanship, an arrest warrant is not required in order to effectuate an arrest for a felony offense. *Lewis*, 36 S.W.3d at 97 (citing T.C.A. § 40-7-103(a)(3)).

A police officer may make a warrantless arrest "when a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested has committed the felony." T.C.A. § 40-7-103(a)(3). "Accordingly, the proper inquiry ... is not whether the warrant was lawful, but whether the arrest itself was lawful." *Lewis*, 36 S.W.3d at 97 (citing *Harris v. State*, 206 Tenn. 276, 287, 332 S.W.2d 675, 680 (1960); *Daugherty v. State,* 478 S.W.2d 921, 922 (Tenn. Crim. App. 1972)). Courts should determine the existence of probable cause after assessing all of the information available to the officer at the time of arrest. *See State v. Woods*, 806 S.W.2d 205, 212 (Tenn. Crim. App. 1990). This court may consider the proof at trial, as well as at the suppression hearing, when considering the appropriateness of the trial court's ruling on a pretrial motion to suppress. *See State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998) (holding that because the rules of appellate procedure "contemplate

that allegations of error should be evaluated in light of the entire record," an appellate court "may consider the proof adduced both at the suppression hearing and at trial").

Detective Achord testified at trial that he was the lead investigator assigned to the case and arrived at the crime scene approximately ten to fifteen minutes after the police dispatcher received a call about the shooting. Detective Achord interviewed the people who were present when the shooting occurred, including Mr. Boone, and he interviewed Mr. Beasley in the hospital. There is nothing in the record to indicate that the eyewitnesses were acting as criminal informants in reporting their observations to the investigating officers. *See Lewis*, 36 S.W.3d at 98-99 (noting that no further showing is necessary regarding the basis of knowledge or veracity of a witness who was a resident of the neighborhood in which the crime occurred).

Our Supreme Court has defined "probable cause" as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." *Henning*, 975 S.W.2d at 294. Based on our review, although the affidavit of complaint should have set forth the basis of Detective Achord's knowledge, we conclude that the information developed during the initial investigation of the crime supports a finding of probable cause for Defendant's arrest. Upon a showing of probable cause to believe that a crime has been committed and that the suspect of the investigation committed that crime, a custodial arrest may properly be made. *State v. Crutcher*, 989 S.W.2d 295, 300 (Tenn. 1999). Thus, the trial court did not err in denying Defendant's motion to suppress his statement to Detective Dunaway on the basis of an illegal arrest. Defendant is not entitled to relief on this issue.

*Davis 1*, 2007 WL 2051446, at *6–8.

An arrest without probable cause violates the Fourth Amendment to the United States Constitution. *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003); *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 589 (6th Cir. 1994). However, the Constitution does not require warrants for felony arrests where there is probable cause for the arrest, and evidence obtained on the occasion of a warrantless arrest are not the product of an illegal arrest. *United States v. Watson*, 423 U.S. 411 (1976). "[E]ven where an arrest warrant is found to be defective, the simple existence of probable cause will support the officer's action." *United States v. Calandrella*, 605 F.2d 236, 246 (6th Cir. 1979) (citing *Whiteley v. Warden*, 401 U.S. 560, 568–69 (1971)). Probable cause to arrest exists when the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the

suspect has committed, is committing or is about to commit an offense." *Michigan v. DeFillippo*, 443

U.S. 31, 37 (1979); *see Thacker*, 328 F.3d at 255. "Whether there exists a probability of criminal

activity is assessed under a reasonableness standard based on an examination of all facts and

circumstances *within an officer's knowledge at the time of an arrest*." *Thacker*, 328 F.3d at 255

(internal citations and quotations omitted) (emphasis in the original).

The state court found that regardless of any technical defect in the affidavit supporting the

warrant, the information known to Detective Achord established probable cause for Petitioner's

arrest. Based on the facts of this case, that conclusion is not contrary to or unreasonable in light of

the applicable federal standards. Petitioner is not entitled to relief on this claim.

### N. Claims 14, 15 and 20: Bernard Report

Petitioner claims that the prosecution withheld Detective E.J. Bernard's report of an interview

of Eula Beasley, thereby facilitating perjury by Beasley and preventing Petitioner from learning the

author of the report in time to impeach Beasley's testimony. (ECF No. 1, at 33, 36; ECF No. 48, at

1, ¶ 2.)

The crux of Petitioner's claim is that Detective Bernard, the author of the interview report

used to refresh Eula Beasley's testimony during trial, was at that time the subject of an investigation

into making false reports. The Petitioner believes this fact is critical because Beasley did not testify

that Petitioner had threatened to kill the victim until his memory was refreshed with a line from the

report to that effect, which he acknowledged having reviewed and initialed. (*See* ECF 36-3, at

116–120.) Petitioner's "new evidence" is a forensic handwriting report dated May 30, 2009, which

indicates that the initials examined on a copy of the report are "more likely than not" matches for the

known handwriting of Detective Bernard. (*See* ECF No. 36-17, at 65–68.) He claims that the state's

delayed production of the report prevented him from developing and offering this evidence at trial and from calling Bernard himself to testify in order to impeach Beasley's testimony. (ECF No. 1, at 36.)

The Court notes that neither Petitioner's direct appeals nor his state petition for post-conviction relief expressly alleged, as he does now, that Bernard's report was suppressed in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). To the contrary, his post-conviction petition listed "newly discovered evidence" – a reference to the handwriting analysis – as the sole ground for the petition, and he did not mark the box on the petition form for the additional ground "(6) Conviction was based on the unconstitutional failure of the prosecution to disclose to defendant evidence favorable to defendant." (ECF No. 36-17, at 42.) His first reference to the report as "suppressed favorable information" was in his appeal from the trial court's denial of his post-conviction petition. (*See* ECF No. 36-18, at 4.) Nevertheless, the state court did not treat the claim as waived, so this Court will disregard that procedural issue and address the reasonableness of the state court's determination.

To establish a *Brady* claim, a petitioner must show that the state withheld exculpatory evidence material to either the petitioner's guilt or punishment. *Brady* at 87. The Supreme Court has articulated "three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (citations and quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the

outcome" of the proceeding. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (citations and quotation marks omitted). Importantly, *Brady* does not apply when the defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory information." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). Similarly, *Brady* does not apply when the factual basis for the claim was readily available to the petitioner or his counsel from a publicly available source. *Bell v. Bell*, 512 F.3d 223, 235 (6th Cir. 2008).

It is apparent from the record that the prosecutor provided defense counsel with a copy of the report during Beasley's direct examination. (ECF No. 36-3, at 121.) The record does not contain any indication that counsel was surprised by the report, and in fact it is clear that defense counsel knew during trial that Bernard had prepared the report, and that the state stipulated that the evidence would prove as much. (ECF Nos. 36-4, at 112; 36-5, at 7.) Moreover, the fact that made the report significant to counsel was a matter of public record:

> Your Honor, my investigator brought to my attention at lunch information from the Tennessean today that indicates that Chief Surpass [sic] is calling for decertification of EJ Bernard. *This is important to us because EJ Bernard wrote the report that was used to rehabilitate Eula Beasley.*

(ECF No. 36-4, at 111–12 (emphasis added).) With the trial court's approval, counsel issued an instanter subpoena for Ronal Serpas, who was then Chief of the Metropolitan Nashville Police Department, seeking to have him testify "that EJ Bernard is believed to have falsified police reports." (ECF No. 36-4, at 112–14.) Counsel disavowed any interest in calling Bernard to testify. (*Id.* at 113.) Ultimately, counsel was only prevented from pursuing testimony about the Bernard false report investigation by the trial court's later ruling that it was not admissible as a matter of evidence:

> THE COURT: But what you've got looking at you, Ms. Morris, is this: General Erb started to read that statement and you objected to it and I sustained the objection. She then showed the statement to Mr. Beasley and asked him to read it. She asked him if he did not, if those were not his initials and if he had not initialed that statement

when he made it as being correct. And that's the proof in this record. And at that point in time he adopted it as his statement under the rule.

Now, why is it relevant now to come in and prove that some officer is now under investigation for a false report in another case, when the witness has adopted the statement as his own in the presence of the jury?

MS. MORRIS: The reason, Your Honor, is because Mr. Beasley, the witness, was equivocal about it. It may be necessary to ask the court reporter –

THE COURT: He was equivocal about it, I'll say that. He said I don't remember exactly, and that's before the jury.

MS. MORRIS: Yes.

THE COURT: But he said I did adopt this statement at that time as my statement and I initialed it.

MS. MORRIS: Yes.

THE COURT: And that's where we are.

MS. MORRIS: When I cross-examined him he stated, as I recall, that he really couldn't remember if he had said something about killing.

THE COURT: I understand that.

MS. MORRIS: On redirect –

THE COURT: That's before the jury.

MS. MORRIS: Yes. And on redirect he was rehabilitated and was then able to come back strong and suddenly change his mind about it. Quite frankly he's shown –

THE COURT: That's your opinion, you know, I might have a different opinion. . . .. That's why we have jurors. That's the jury's job. I'm not going to allow any testimony with regard to the investigation of Mr. Bernard in another case or I'm not going to allow any testimony with regard to what Chief Serpas is looking into. It's not relevant to this case. The witness has adopted that statement.

(ECF No. 36-4, at 146– 48.) The trial court *sua sponte* suggested a testimonial offer of proof from the defense on this issue. (ECF No. 36-4, at 149.) Accordingly, after trial the defense offered the testimony of Kennetha Sawyers, Director of the Office of Professional Accountability for the Metropolitan Nashville Police Department. (ECF No. 36-5, at 8.) Sawyers testified that an investigation into Detective Bernard's handling of another case had led to the determination that he

had submitted false and inaccurate reports in that case, where the medical examiner witness disputed the accuracy of the report of his statement. (ECF No. 36-5, at 8–27.)

There is nothing in the record to suggest that the Petitioner expressed any desire to obtain or offer a handwriting analysis in connection with the report, or to offer the testimony of any other witnesses about its substance, or that he was prevented from doing so.

On direct appeal, the state court affirmed the trial court's ruling that evidence of the Bernard investigation was not admissible in light of the fact that Beasley had acknowledged its accuracy under oath:

> Detective E.J. Bernard, with the Metro Nashville Police Department, took Mr. Beasley's statement during the investigation of the killing and reduced Mr. Beasley's oral statements to writing. During the trial of the case *sub judice*, a newspaper article reported that Detective Bernard was currently under investigation by the police department in response to an allegation that Detective Bernard had falsified a report in another unrelated case. The trial court denied, on relevancy grounds, defense counsel's request to bring this information to the jury's attention. Defendant contends that Detective Bernard is the "declarant" of Mr. Beasley's written statement for purposes of Rule 806 of the Tennessee Rules of Evidence. Defendant thus argues that the trial court erred in not allowing him to impeach the credibility of Detective Bernard's written memorialization of Mr. Beasley's statement. Defendant's reliance on Rule 806, however, is misplaced. A declarant is a person who makes a "statement" which is defined as "an oral or written assertion." Tenn. R. Evid. 801. Mr. Beasley is considered the declarant of the oral assertions which were later reduced to writing. Thus, Rule 806 is not applicable.

> Mr. Beasley testified on redirect examination that he had reviewed his written statement a few weeks before trial and confirmed its accuracy. At no time did Mr. Beasley indicate that any portion of his statement had been incorrectly recorded. The trial court did not err in excluding the proffered evidence on relevancy grounds. Defendant is not entitled to relief on this issue.

*Davis 1*, 2007 WL 2051446, at *15.

On appeal from the denial of Petitioner's post-conviction petition, the Tennessee Court of Criminal Appeals rejected the claim that the state had improperly delayed production of Bernard's

report to prevent the defense from preparing for it, citing the state rule requiring production of a witness's statement after the witness testifies. *Davis 3*, 2010 WL 1947379, at *3 (citing Tenn. R. Crim P. 26.2(a)). Moreover, the state court concluded that Petitioner at trial "was prepared to offer evidence that Detective Bernard had forged the police statement," and that his "failure to obtain a handwriting expert was not a result of improper State conduct." *Id.*

Long after his conviction, Petitioner procured an affidavit from Beasley, in which Beasley states that, contrary to his testimony at trial, he did not initial the Bernard report and did not hear Petitioner threaten to kill anyone. (ECF No. 36-36, at 9–10.) Beasley's affidavit states that he is "admitting that [he] testified falsely at trial." (*Id.* at 9.) Notably, however, the affidavit still does not deny that the Bernard report accurately reflects the statement he gave the day of the murder or provide any basis for concluding that the prosecution knew at trial that his testimony was false.

In order to establish a constitutional violation in connection with false testimony, a petitioner must show that the testimony was indisputably false, that the prosecution knew it was false, and that it was material. *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000). In this case Beasley has been so inconsistent with regard to the exact language of the threat he heard Petitioner make that it would be impossible to conclude that any version he has given is indisputably false. In fact, as the state court found in rejecting his claim based on Beasley's post-trial affidavit, Beasley's testimony at trial was sufficiently noncommittal to leave room for the possibility that he did not actually hear Petitioner specifically threaten to "kill" the victim:

> Beasley testified that he was "not positive" when asked if the Petitioner used the word "kill." In fact, even after being shown his statement to police, Mr. Beasley "continued to equivocate over whether [the Petitioner] had used the word 'kill' in his threat." Mr. Beasley only testified that he told the police the Petitioner had used the word "kill" and that he thought that was what Petitioner had said.

*Davis 5*, 2012 WL 3017806, at *4 (citations omitted).

Even assuming that Beasley is now telling the truth and that he is certain he did not hear Petitioner threaten to kill the victim, there is nothing in the record to suggest that the prosecution knew that Beasley was lying. Moreover, as the state court went on to explain, the exact language of Petitioner's threat is not as material as he seems to believe:

> Furthermore, despite the Petitioner's assertions, testimony about whether he used the word "kill" was not the only evidence of premeditation. Mr. Beasley testified that the Petitioner told the victim, "[B]itch, I'm going to get you, don't be in this house when I come back." Additionally, a second witness testified that the Petitioner said, "[W]hen I come back I'm going to shoot this m----- f----- up." Therefore, a jury would not have reached a different conclusion had Mr. Beasley testified that the Petitioner never used the word "kill."

*Davis 5*, 2012 WL 3017806, at *4 (citations omitted).

Petitioner has not established that any of the state court rulings on this claim were contrary to or an unreasonable application of clearly established federal law. Nothing in the substance of the report was exculpatory, and there is no reason to believe that the prosecution knew that Beasley's adoption of it at trial was allegedly false. Moreover, as both the trial court and defense counsel acknowledged in the exchange quoted above, counsel was able on cross-examination to force Beasley to equivocate about whether he had actually said anything to Bernard about a threat by Davis to kill the victim. She was further able to impeach Beasley with his extensive criminal record and with the conflict between his conviction for assault and his testimony that he was not violent. In light of the extent and effectiveness of the cross-examination allowed, and the overwhelming weight of the evidence of Petitioner's guilt, Petitioner's suspicions about Bernard's report – and the evidence he has offered in support of those suspicions – do not undermine the confidence in the outcome of the trial. This claim therefore fails.

### O.    Claims 16 thru 19 and 22: Ineffective Assistance of Counsel

Petitioner alleges that his former counsel was ineffective in five instances:

1. Failing to seek a continuance to prepare to cross-examine Beasley (ECF No. 43, at 2, ¶ A);

2. Failing to hire a hand-writing expert to determine whether Beasley signed the statement used to refresh his recollection (*Id.* at 2, ¶ B);

3. Failing to discover before trial that Detective Bernard took Beasley's statement and was under investigation for making a false report (*Id.* at 2, ¶ C);

4. Failing to present any defense to the charges against him (ECF No. 48, at 1, ¶);

5. Failing to timely raise any of the issues alleged in the petition (*Id.* at 2, ¶ 4).

The full extent of Petitioner's final ineffective assistance claim as set forth in his second supplemental pleading is that "Petitioner was denied the effective assistance of counsel for any alleged failure to properly raise any of the issues alleged in his habeas corpus petition at an earlier point in the proceedings, in violation of the Sixth, Eighth and Fourteenth Amendments." (ECF No. 48, at 2, ¶ 4.)  This vague attempt at a catch-all ineffective assistance claim does not state a claim for relief as required by Rule 2 of the Rules Governing Habeas Corpus Cases Under Section 2254, and will be DISMISSED on that basis. *See Clemons v. Luebbers,* 212 F. Supp. 2d 1105, 1135 (E.D. Mo. 2002) (holding that "Ground 15 is a  catch-all claim that any failure to preserve claims or exhaust remedies was caused by ineffective assistance of counsel. This claim presents no grounds for habeas relief, and none will be granted."), *rev'd in part on other grounds,* 381 F.3d 744 (8th Cir. 2004); *Griffey v. Hubbard,* C 01-3483 FMS, 2004 WL 941234 (N.D. Cal. Apr. 29, 2004) (rejecting as "conclusory catchall" petitioner's claim that "To the extent defense counsel failed to further develop the factual basis and to preserve the record with regard to the foregoing errors, petitioner was deprived of effective assistance of counsel as guaranteed by the Sixth Amendment").

Respondent argues that all of these claims are barred by 28 U.S.C. § 2244(d), which imposes a one year statute of limitations on habeas corpus claims, which begins to run the day a petitioner's conviction becomes final and is tolled during the pendency of any properly filed post-conviction or other collateral review proceeding. All of these ineffective assistance claims are asserted in Petitioner's supplemental petitions, the first of which is deemed filed as of May 23, 2013 (ECF No. 43, at 2), and there is no doubt that they are barred by the statute of limitations unless they can be deemed to relate back to the filing of the original petition.[10]

Under certain conditions, the relation-back doctrine under Fed.R.Civ.P. 15(c)(2) can apply in a federal habeas action, but only to the extent that its application does not conflict with the AEDPA limitation period and the challenged claim is tied to the facts alleged in the original petition. *Mayle v. Felix*, 545 U.S. 644, 649 (2005). As the Supreme Court stated in *Mayle*:

> An amended habeas petition, we hold, does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.
>
> * * *
>
> Habeas Corpus Rule 11 permits application of the Federal Rules of Civil Procedure in habeas cases "to the extent that [the civil rules] are not inconsistent with any statutory provisions or [the habeas] rules ..." Section 2242 specifically provides that habeas applications "may be amended ... as provided in the rules of procedure applicable to civil actions."
>
> * * *

---

[10] Petitioner's conviction became final on June 16, 2009, the day after the United States Supreme Court denied certiorari on his direct appeal (*see* ECF No. 36-16, at 2), and Petitioner tolled his limitations period when he filed his petition for post-conviction relief 29 days later, on July 15, 2009. (*See* ECF No. 36-17, at 37.) The limitations period began to run again on November 12, 2010, the first business day after the Tennessee Supreme Court denied permission to appeal from the dismissal of his post-conviction action. *See Davis 3*, 2010 WL 1947379, at *1 (reflecting app. denied Nov. 10, 2010). Another 167 days elapsed before Petitioner again tolled the limitations period by filing his second petition for writ of error coram nobis on April 27, 2011. (*See* ECF No. 36-26, at 4.) The Tennessee Court of Criminal Appeals affirmed the denial of that petition on July 23, 2012, *Davis 5*, 2012 WL 3017806 (July 23, 2012), and the running of the limitations period resumed on September 24, 2012, after the expiration of Petitioner's time to seek review by the state supreme court. Petitioner's remaining 169 days of the one-year limitations period therefore expired on March 12, 2013, more than 22 months before he filed either of his supplemental pleadings.

If claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance.

* * *

*So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order.*

*Id.* at 650, 654, 662, 664 (emphasis added).

Petitioner's fourth ineffective assistance claim – for failure to present a defense – does not even arguably arise from the same operative facts as any of his original claims and will be DISMISSED as time-barred.

The three claims relating to Beasley's testimony and the Bernard report, however, do arise from a common core of facts shared with several of Petitioner's original claims, and the Court concludes that they are sufficiently connected to relate back to the filing of the original petition. They are therefore deemed to be timely.

However, none of these claims was raised in state court. Respondent acknowledges that ineffective assistance of post-conviction counsel may constitute cause for the procedural default of substantial ineffective assistance of trial counsel claims under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). He urges, however, that Petitioner's claims are still barred by procedural default because they are not substantial. (ECF No. 60, at 53.)

As explained above, in order to demonstrate the actual prejudice necessary to overcome procedural default, the Petitioner must ultimately show that the underlying ineffective assistance claims are "substantial," meaning that they have some merit. *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014) (quoting *Martinez v. Ryan*, 132 S. Ct. 1309, 1318–19 (2012)). As a practical matter,

this means that Petitioner must demonstrate that trial counsel's performance was constitutionally deficient and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

Petitioner first asserts that trial counsel was ineffective for failing to seek a continuance to prepare to cross-examine Beasley. (ECF No. 43, at 2, ¶ A.)  The record demonstrates, however, that counsel was fully prepared to cross-examine Beasley and did so effectively.  In a cross-examination covering 32 pages of transcript, counsel led Beasley to admit that he was smoking crack and getting high the day of the murder and was at the victim's apartment for that purpose (ECF No. 36-3, at 152, 163–64), and that he had numerous criminal convictions. (*Id.* at 172–75.)  Counsel was even sufficiently prepared and attentive to take advantage of Beasley's off-hand remark that he had never been violent in order to introduce otherwise inadmissible evidence of his conviction for assault of his wife. (*Id.* at 169–72.)   Most significantly, counsel's cross-examination elicited Beasley's acknowledgment that he was not "a hundred percent sure" whether Petitioner had said anything about killing the victim and that he may have given varying statements on that point (*id.* at 161–63), and that the detective who spoke with him the day of the murder did not "go into details on this and that" and did not tape record their conversation. (*Id.* at 178–80.)  Counsel had caused a private investigator to interview Beasley months before trial and prepare a report, which she used during cross-examination. (*Id.* at 157.)  And as discussed above, the trial court improperly prevented counsel from cross-examining Beasley about any possible bias for the prosecution in connection with several charges against him that were dismissed shortly before his testimony, but she was obviously prepared to do so and had equipped herself with the appropriate federal case law citation to support her point. (*Id.* at 140–44.)

The supplemental petition does not explain what additional preparation Petitioner believes was necessary for Beasley's cross-examination, and the record does not demonstrate that Petitioner's trial counsel fell below any objective standard of reasonableness as required for a finding of ineffectiveness under *Strickland*. *See Strickland*, 466 U.S. at 688. Accordingly, this claim is not "substantial" and will be DISMISSED as barred by procedural default.

Petitioner next alleges his counsel was ineffective for failing to hire a handwriting expert to examine the handwritten initials on Bernard's report that Beasley testified were his. (ECF No. 43, at 2, ¶ B.) Based on his focus on handwriting evidence, Petitioner appears to be under the false impression that proving that Beasley did not initial Bernard's report would somehow exonerate him. To the contrary, determining who initialed the report – which was not even entered into evidence at trial – is not material to Petitioner's guilt or innocence. What *is* material is the testimony, provided by both Beasley and Boone, that Petitioner threatened the victim during a violent altercation and that he returned to her apartment shortly thereafter and shot her. As the state court reasonably concluded, "regardless of who initialed the statement, Mr. Beasley testified that the written statement accurately reflected what he orally told the police. Whether Mr. Beasley did or did not initial the statement would not change the substance of that testimony." *Davis 5*, 2012 WL 3017806, at *4. Although proving that Beasley was lying or mistaken when he testified that he had initialed the report might have done some harm to his credibility, the incremental value of that harm would have been very low in the context of his equivocation about whether he heard Petitioner say he would kill the victim and the other credibility issues revealed by cross-examination. Accordingly, counsel's failure to devote time and resources to the question of who initialed the report was not objectively sub-standard and did not prejudice Petitioner. This claim is therefore not substantial and cannot overcome the procedural default bar.

Finally, Petitioner asserts that trial counsel was ineffective for not discovering prior to trial that Bernard had taken Beasley's statement and was under investigation for making false reports. (ECF No. 43, at 2, ¶ C.)  It is not clear from the record when, in fact, counsel made that discovery. Moreover, aside from his claims that are already rejected above, Petitioner does not explain how an earlier discovery would have benefitted his case or impacted its outcome in any way.  Because this claim does not have sufficient merit to be deemed substantial, it is procedurally defaulted.

## P.    Claim 23: Cumulative Errors

Petitioner alleges that the cumulative affect of the errors alleged in his petition amount to a denial of due process. (ECF. No. 48, at 2, ¶ 5.)  This claim was not raised in state court and is procedurally defaulted.  Moreover, the it does not state a claim for habeas relief.  "The law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006).

## VI. CONCLUSION

For the reasons set forth herein, Phedrek Davis's petition under § 2254 will be DENIED and this action will be DISMISSED with prejudice. As all of Petitioner's claims were amenable to disposition on the state record, his motion for evidentiary hearing will be DENIED.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. The petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA must "indicate which specific issue or issues satisfy the [required] showing . . . ." 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when the petitioner demonstrates that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "[A] COA does not require a showing that the appeal will succeed." *Miller-El*, 537 U.S. at 337. Courts should not issue a COA as a matter of course. *Id.*

In this case, only 11 of Petitioner's 23 claims were fully exhausted and therefore reviewable on the merits. Petitioner failed to show any error of constitutional dimension in the state court's resolution of those claims, however. The other 12 claims are procedurally defaulted, and Petitioner is unable to establish the cause and prejudice necessary to overcome the procedural default. Because an appeal by Petitioner on any of the issues raised in his petition would not merit further attention,

the Court will deny a COA. Petitioner may, however, seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate order is filed herewith.

_____
Todd Campbell
United States District Judge